**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
　　　　　　　　　　　　　　　　　)
HERITAGE FOUNDATION.,　　　　　)
214 Massachusetts Ave. N.E.　　　　)
Washington, D.C.  20002　　　　　　)
　　　　　　　　　　　　　　　　　)
ROMAN JANKOWSKI　　　　　　　)
214 Massachusetts Ave. N.E.　　　　)
Washington, D.C.  20002　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　_Plaintiffs_,　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　Case No. 22-cv-2671
　　　　　　　　　　　　　　　　　)
NATIONAL ARCHIVES AND　　　　　)
RECORDS ADMINISTRATION　　　　)
700 Pennsylvania Ave., N.W.　　　　)
Washington, D.C.  20408　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　_Defendant_.　　　)
_____)


**<u>COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

Plaintiffs, THE HERITAGE FOUNDATION and ROMAN JANKOWSKI (collectively "Plaintiffs"), bring a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, suit against the Defendant, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION ("NARA"), to compel the production of information related to NARA's interactions with former President Donald J. Trump, the White House, the Department of Justice, and others concerning the application of the Presidential Records Act and related issues to President Trump.

1.　　In violation of the FOIA and NARA regulations, the Defendant has failed to issue a determination and records within the statutory deadline.

<u>PARTIES</u>

2.      Plaintiff, The Heritage Foundation, is a Washington, D.C.-based nonpartisan public policy organization with a national and international reputation whose mission is to "formulate and promote public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense." Heritage Foundation*, About Heritage*, https://www.heritage.org/about-heritage/mission (last visited Sept. 6, 2022).  Heritage is a not-for-profit section 501(c)(3) organization which engages in substantial dissemination of information to the public.  Heritage operates a national news outlet, *The Daily Signal*.

3.      Plaintiff Roman Jankowski is Senior Investigative Counsel at the Heritage Foundation's Oversight Project and is an author for *The Daily Signal*.  The Oversight Project is an initiative aimed at obtaining information via Freedom of Information Act requests and other means in order to best inform the public and Congress for the purposes of Congressional oversight.  The requests and analysis of information is informed by Heritage's deep policy expertise.

4.      Defendant NARA is a federal agency of the United States within the meaning of 5 U.S.C. § 552(f)(1) which describes itself as "the nation's record keeper.  Of all documents and materials created . . . by the United States Federal government, only 1%–3% are so important for legal or historical reasons that they are kept by us forever."  NARA FAQs, https://www.archives.gov/faqs (last visited Sept. 6, 2022).  NARA purports to be "an independent establishment in the executive branch of the Government."  44 U.S.C. § 2102.  "The Administration shall be administered under the supervision and direction of the Archivist."  *Id.* at § 2102.  The Archivist is appointed by the President by and with the advice and consent of the

Senate.  *Id.* at 2103.  "The Archivist may be removed from office by the President.  The President shall communicate the reasons for any such removal to each House of the Congress."  *Id.*

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) because this action is brought in the District of Columbia and 28 U.S.C. § 1331 because the resolution of disputes under FOIA presents a federal question.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant NARA's principal place of business is in the District of Columbia.

## BACKGROUND
## The Presidential Records Act ("PRA")
### Application of the PRA to an Incumbent President

7.      The Presidential Records Act, 44 U.S.C. § 2201 *et seq.*, governs "Presidential records."  Under the PRA "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter."  *Id.* § 2202.  The PRA applies dramatically different rules to a current President as opposed to a former President.  The Supreme Court has not addressed the functioning of the PRA, and the judicial decisions that do exist conflict on key points.

8.      The PRA defines "Presidential records" as:

"[D]ocumentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."

*Id.* at § 2201(2)(A).  This definition:

does *not* include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code); (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

*Id.* at § 2201(2)(B) (emphasis added).  The PRA in turn defines "personal records" to mean:

all documentary materials, or any reasonably segregable portion thereof of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term includes—

> (A) diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business;
> (B) materials relating to private political associations, and having no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; and
> (C) materials relating exclusively to the President's own election to the office of the Presidency; and materials directly relating to the election of a particular individual or individuals to Federal, State, or local office, which have no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* at § 2201(3).

9.      As to the decision of the "classification" of a record, the PRA provides:

Documentary materials produced or received by the President, the President's staff, or units or individuals in the Executive Office of the President the function of which is to advise or assist the President, shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately.

*Id.* at § 2203(b).

10.     The PRA further "provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records.'"  *CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) (*citing* 44 U.S.C. § 2203(f)).

11.     As a general matter, the D.C. Circuit has held that "the PRA accords the President virtually complete control over his records during his term of office."  *Armstrong v. Bush*, 934

F.2d 282, 290 (D.C. Cir. 1991) ("*Armstrong I*").  From this it concluded that the PRA "precludes

judicial review of the President's recordkeeping practices and decisions."  *Id.* at 291.

12.    There is an exceedingly narrow exception to the rule of preclusion of judicial

review under *Armstrong I*:

> The PRA delineates those records over which the President may exercise "virtually complete control" during his term of office, [*Armstrong*, 934 F.2d] at 290, and the courts may not restrict that control by reviewing the President's recordkeeping practices and decisions.  *Id.* at 291.  But the courts are accorded the power to review guidelines outlining what is, and what is not, a "presidential record" under the terms of the PRA.  The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review.  Rather, it provides that all materials that were subject to the FOIA, 5 U.S.C. § 552, prior to the passage of the PRA remain subject to the FOIA and do not qualify as "presidential records."  Thus, the court may review the EOP guidelines for the limited purpose of ensuring that they do not encompass within their operational definition of presidential records materials properly subject to the FOIA.

*Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) ("*Armstrong II*").  In announcing this holding

*Armstrong II* reiterated that the PRA precluded all other review of Presidential record

management.  1 F.3d at 1294; *see also CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019)

(PRA precludes review of "day to day operations").  The definition of a "guideline" under

*Armstrong II* appears to be limited solely to "guidelines that categorize materials as presidential

records, such that by doing so, any agency may run afoul of the PRA's *definition* of Presidential

records."  *Doyle v. DHS*, 331 F.Supp.3d 27, 65 (2018) (emphasis added); *see also, CREW v.*

*Trump*, 438 F.Supp.3d 54 (2020) (similar); *CREW v. Cheney*, 593 F.Supp.2d 194, 220 (D.D.C.

2009) (Plaintiff stated claim under *Armstrong II* by alleging Vice President by policy sought to

"change the definition of Vice-Presidential records" under the PRA).[1]

---

[1] Vice-Presidential records are subject to the PRA 'in the same manner as Presidential records." 44 U.S.C. § 2207.

13.     While a President is in Office, the Archivist and NARA have virtually no role or authority.  *See, e.g.*, *Cheney*, 593 F.Supp.2d at 224 ("Clearly, Plaintiffs in this case challenge the guidelines used by the Vice President, the OVP, and the EOP to classify records (as opposed to any particular disposal decisions), but there is a similar dearth of statutory authority granting the Archivist or NARA any role in approving or disapproving the implementation of classification guidelines.  *See* 44 U.S.C. § 2201 *et seq.*  Only after the Vice President has left office does the Archivist's role under the PRA expand."); *id.* at 171 ("The Court understands Plaintiffs' exasperation with "a law to preserve [P]residential records for public ownership and access [that] leaves it to the total discretion of the [P]resident and [V]ice [P]resident to define what constitutes a [Vice-] [P]residential record in the first place." Pls.' Reply at 13.  The Court is nevertheless bound to apply the PRA as Congress enacted it.  In doing so, the Court is left with the undeniable conclusion that Congress vested almost no authority in the Archivist and NARA over Vice–Presidential records during a Vice President's term in office.").

### Application of the PRA to a Former President

14.     "Upon the conclusion of a President's term of office, . . . the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(g)(1).  The Department of Justice has taken the position that the Archivist automatically becomes the custodian of all records the former President previously designated as Presidential records at the moment Presidential power is transferred, regardless of who has actual physical custody of those records.  *See Responsibility for the Electronic Presidential Records on Hardware of the Executive Office of the President After a Presidential Transition*, 2021 WL 222746, *2 (Op. OLC Jan. 15, 2021).  The process of physically transferring those records necessarily takes time.  *Id.* (noting that electronic transfer of

records from White House servers to the NARA would take some amount of time); *id.* *3
("According to NARA, EOP personnel have regularly located prior Administrations' paper
presidential records accidentally left behind within the EOP.  When this has happened EOP
personnel have treated them as presidential records subject to the Archivist's control and
promptly transferred them to NARA").  No deadlines are provided for transfer of physical
custody, but the Archivist has "an affirmative duty to make such records available to the public
as rapidly and completely as possible consistent with the provisions of this chapter." 44 U.S.C.
§ 2203(g)(1).

15.     Once the Archivist has obtained physical custody of a Presidential record over
which he has "assumed responsibility" under 44 U.S.C. § 2203(g)(1) he "shall deposit all such
Presidential records in a Presidential archival depository or another archival facility operated by
the United States."  *Id.* at § 2203(g)(2).

16.     The Department of Justice takes the position that the statutory phrase "the
Presidential records of that President" (*id.* at § 2203(g)(1)) refers to the existing collection of
records designated by the former President as Presidential records.  *See* NARA Mot. to Dismiss
at 13 n.1, *Judicial Watch v. NARA*, 1:10-cv-01834 (PLF) (D.D.C. Jan. 3, 2011); Reply in Support
of Mot. to Dismiss at 6, *Judicial Watch v. NARA*, 1:10-cv-01834 (PLF) (D.D.C. Mar. 15, 2011).
The only District Court to address this question adopted the Department's view.  *See Judicial
Watch v. NARA*, 845 F.Supp.2d 288, 300 (D.D.C. 2012) ("The Court construes this language as
requiring the Archivist to take responsibility for records *that were designated as Presidential
records during the President's term*.").

17.     The Department of Justice has also taken the view that when a President retains a
record and does not transfer it to NARA at the end of his Presidency, absent indication to the

contrary, the President has designated that record as personal.  *See* Reply in Support of Mot. to

Dismiss at 14, *Judicial Watch v. NARA*, 1:10-cv-01834 (PLF) (D.D.C. Mar. 15, 2011).

18.     At this point a key questions arises:  *Is a former President's classification of*

*specific records reviewable*?

19.     Only a handful of courts have addressed whether *Armstrong I & II* preclude any

*judicial* review of a classification.  In *Am. Hist. Ass'n v. Peterson*, 876 F.Supp. 1300 (D.D.C.

1995) the Court wrote:

> *Armstrong II* does not necessarily foreclose judicial review of a decision to denominate
> certain materials "personal records" of a former President.  Such judicial review may be
> available to ensure that Presidential records are not disposed of as personal records at the
> end of an Administration and that, instead, all Presidential records fall subject to the
> Archivist's "affirmative duty to make such records available to the public." 44 U.S.C.
> § 2203(f)(1) (emphasis added).

*Id.* at 1314.  But this reasoning is in the speculative ("necessarily" and "may") and in any event

was clearly *dicta*; the "classification" reviewed in *Peterson* was clearly a "guideline" under

*Armstrong II*.  *See id.* at 1313–1314.[2]  The *Judicial Watch* Court opined in *dicta* that it had

"serious doubts" as to reviewability of individual classification decisions.  *Id.* at 298.  Another

District Judge used imprecise language that could be read either way in *CREW v. Cheney*, 580

F.Supp.2d 168 (D.D.C. 2008).  There, the Court held that "the D.C. Circuit expressly recognized

in *Armstrong v. EOP*, 1 F.3d 1274 (D.C.Cir.1993), that district courts may review Presidential

Records Act classification decisions (and guidelines related thereto) *of the sort that are at issue*

*in this litigation*."  *Id.* at 171 (emphasis added).  The Court then repeated a broad reading of

*Armstrong II*:  "Rather, the PRA permits review of issues associated with the "initial

classification of materials," which also permits review of "guidelines describing which existing

_____

[2] *But see CREW v. Cheney*, 593 F.Supp.2d 194, 215–16 (2009) (Peterson's language regarding
reviewing a Presidential classification decision is a holding).

materials will be treated as presidential records in the first place . . . ." *Id.* at 1294 (emphasis in original omitted)." *Id.* at 178.  Query whether this passage eliminated the qualifier in the prior statement.  The Court then immediately went on to hold review was available because:

> The core issues in this case concern Defendants' interpretations of the PRA's language that defines Vice Presidential records as those relating to his "constitutional, statutory, or other official or ceremonial duties of the President."  An area of inquiry that falls squarely within the classification decisions identified in *Armstrong II* as judicially reviewable is whether Defendants have properly interpreted this language by using the two sub-definitions included in Ms. O'Donnell's declarations and in counsel's various representations.

*Id.* at 178.  The Court provided no clarity as to whether it held any classification decision reviewable, or whether it held that a President's construction of the PRA's definitional provisions was reviewable.  The question is decidedly unsettled.

20.     Only one Court has addressed the related question of whether *NARA* can review a President's designation of a particular record as personal.  In *Judicial Watch*, the Court confronted a claim audiotapes President William J. Clinton made during his term in Office and subsequently retained should be deemed to be Presidential records by NARA.  *Judicial Watch*, 845 F.Supp.2d at 290–91.  The *Judicial Watch* Court held:

> [T]he PRA does not confer any mandatory or even discretionary authority on the Archivist to classify records.  Under the statute, this responsibility is left solely to the President. 44 U.S.C. § 2203(a)–(b).  While the plaintiff casts this lawsuit as a challenge to a decision made by the National Archives, the PRA makes it clear that this is not a decision the Archivist can make, and in this particular case, it is not a decision the Archivist did make because President Clinton's term ended in 2000, and the tapes were not provided to the Archives at that time.

*Id.* at 301.

21.     The Department of Justice takes the position that NARA in conjunction with the Attorney General *can* review a former President's classification of a record as personal, but only by using what the Department terms an "administrative enforcement scheme."  NARA Mot. to

Dismiss at 13, *Judicial Watch v. NARA*, 1:10-cv-01834 (PLF) (D.D.C. Jan. 3, 2011).  In the

Department's view NARA can recover records from a former President that NARA deems to be

Presidential records under the following statutory "enforcement" scheme:

> [T]he PRA allows the Archivist of the United States, "[w]hen the Archivist considers it to be in the public interest," to invoke the FRA's enforcement scheme. 44 U.S.C. § 2112(c). And under the FRA's scheme, "the Archivist shall request the Attorney General to initiate" an action for the recovery of missing records, and "shall notify the Congress when such a request has been made."  *See id.* §§ 2905(a), 3106.

*Id.*; *see also Trans. of Oral Argument* at 6:22–7:7, *Judicial Watch v. NARA*, 1:10-cv-01834

(ABJ) (D.D.C. Oct. 14, 2011).

22.     As a matter of plain statutory text, the Department's position appears to be wrong:

NARA and the Attorney General lack authority under the cited statutes to initiate an action to

retrieve a record a former President retained as a personal.  Start and end with 44 U.S.C.

§ 2112(c).  It provides:

> When the Archivist considers it to be in the public interest, he may exercise, with respect to papers, documents, or other historical materials *deposited under this section, or otherwise, in a Presidential archival depository*, all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control.

*Id.* (emphasis added).  Its scope is necessarily limited to materials that have been "*deposited*" "*in*

*a Presidential archival depository*."  By the Department's own construction of 44 U.S.C.

§ 2203(g) a record retained by a former President definitionally cannot have been "deposited"

"in a Presidential archival depository."  There is no language in 44 U.S.C. § 3106 to the contrary.

The *Judicial Watch* Court reached a contrary conclusion, but without any adversarial testing.

845 F.Supp.2d at 302.

**NARA's Interactions With President Trump Concerning the PRA**

23.     On February 7, 2022, NARA issued a statement to the press in response to

reporting concerning whether former President Donald J. Trump had complied with the PRA.

NARA explained that in "mid-January 2022, NARA arranged for the transport from the Trump

Mar-a-Lago property in Florida to the National Archives of 15 boxes that contained Presidential

records, following discussions with President Trump's representatives in 2021." NARA, *Press

Statements in Response to Media Queries About Presidential Records*,

https://www.archives.gov/press/press-releases/2022/nr22-001 (last visited Sept. 6, 2022).

According to NARA, "Former President Trump's representatives have informed NARA that they

are continuing to search for additional Presidential records that belong to the National Archives."

*Id.*

24.     NARA issued a further statement on February 8, 2022:

> Throughout the course of the last year, NARA obtained the cooperation of Trump
> representatives to locate Presidential records that had not been transferred to the National
> Archives at the end of the Trump administration. When a representative informed NARA
> in December 2021 that they had located some records, NARA arranged for them to
> be securely transported to Washington. NARA officials did not visit or "raid" the Mar-a-
> Lago property.

*Id.*

25.     NARA provided more context to these statements in a February 18, 2022 letter to

the House Committee on Oversight and Reform Chairwoman Carolyn B. Maloney. According

to NARA:

> - "NARA had ongoing communications with the representatives of former
>   President Trump throughout 2021, which resulted in the transfer of 15 boxes to
>   NARA in January 2022." Letter from the Hon. David S. Farriero, Archivist of the
>   U.S. to the Hon. Carolyn B. Maloney, Chairman H. Comm. on Oversight &
>   Reform, at 1 (Feb. 18, 2022).

- "NARA has identified items marked as classified national security information within the boxes." *Id.* at 2.

- "Because NARA identified classified information in the boxes, NARA staff has been in communication with the Department of Justice." *Id.*

- "NARA has identified certain social media records that were not captured and preserved by the Trump Administration.  NARA has also learned that some White House staff conducted official business using non-official electronic messaging accounts that were not copied or forwarded into their official electronic messaging accounts, as required by section 2209 of the PRA.  NARA has already obtained or is in the process of obtaining some of those records." *Id.*

- "NARA has asked the representatives of former President Trump to continue to search for any additional Presidential records that have not been transferred to NARA, as required by the Presidential Records Act." *Id.*

26.     Apparently, the transfer of the 15 boxes was the culmination of a series of interactions between NARA and President Trump.  "On or about May 6, 2021, NARA made a request for the missing PRA records, and continued to make requests until approximately late December 21, when NARA was informed twelve boxes were found and ready for retrieval." Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize, ¶ 39, *In Re Sealed Search Warrant*, 22-mj-08332 (BER) (Aug. 5, 2022).

27.     Unbeknownst to the public until a Magistrate Judge ordered disclosure over the Government's objection, on February 9, 2022, the Special Agent in Charge of NARA's Office of the Inspector General sent a criminal referral to the Department of Justice.  *See* Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize, ¶ 24, *In Re Sealed Search Warrant*, 9:22-mj-08332 (BER) (Aug. 5, 2022).  According to "NARA's White House Liaison Division Director" a "preliminary review" of the 15 boxes transferred from President Trump to NARA in February of 2022 revealed they contained "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and 'a lot of classified records.'  Of most significant concern was that

highly classified records were unfoldered, intermixed with other records, and otherwise

unproperly [sic] identified." *Id.*

28.    President Trump has stated that subsequent to the transfer of the fifteen boxes, he

had interactions with the White House, DOJ, and NARA regarding issues of executive privilege

that arose from the 15 boxes.  Motion for Judicial Oversight at 5, *In Re Search of Mar-a-Lago*,

9:22-cv-81294 (AMC) (S.D. Fla. Aug. 22, 2022) (ECF No. 1).

29.    Subsequently, NARA had numerous communications with President Trump's

representatives and White House Counsel's Office concerning the fifteen boxes.  *See U.S.*

*Response to Mot. for Jud. Oversight & Additional Relief* at Attachment B, No. 22-cv-81294

(AMC) (S.D. Fla. Aug. 30, 2022) (ECF No. 48).  NARA also was delegated authority by

President Joseph R. Biden to adjudicate certain claims of Executive Privilege made by President

Trump—which it rejected.  *Id.*

### August 8, 2022, Search of Mar-a-Lago

30.    "On August 8, 2022, the Department of Justice executed a search warrant at the

premises located at 1100 S. Ocean Blvd., Palm Beach, Florida 33480, a property of former

President Donald J. Trump."  U.S.' Omnibus Response to Motions to Unseal at 1, *In Re Sealed*

*Search Warrant*, No. 22-mj-8332 (BER) (S.D. Fla. Aug. 15, 2022) (ECF No. 59), App. B 021.[3]

31.    CBS reported:

The FBI took boxes and documents while executing a search warrant at former
President Donald Trump's home in Florida on Monday, two sources confirmed to CBS
News. No electronics were taken, according to the sources.

Trump said Monday night that his Mar-a-Lago resort was being "raided" by the
FBI. Sources confirmed to CBS News that the search was connected to a Justice
Department investigation that was prompted by the National Archives earlier this year,

---

[3] "App." citations reference the three Appendices submitted to NARA in support of Plaintiffs'
request for expedited processing.

when the agency said it found 15 boxes of presidential records, including classified material, at Mar-a-Lago.

CBS, *FBI Took Boxes and Documents in Trump Search* (Aug. 9, 2022).

32.     The media coverage of the raid—including questions regarding NARA's role—has been immense and continuous.  *See* Apps A & C (collecting articles).

33.     That media coverage has nearly continuously surfaced "possible questions that affect public confidence in the Government's integrity" concerning both the raid and the disposition of President Trump's records.  These questions have specifically focused on NARA as well as on President Trump's compliance with the PRA.

34.     On the one hand, coverage has repeatedly raised the specter that President Trump was a serial violator of the PRA.  This coverage necessarily involved President Trump's interactions with NARA.  Given the importance of recordkeeping to principles of electoral accountability that undergird our Republican system of government, that cannot help but undermine public confidence in the integrity of the Government.

35.     On the other hand, the actions of the Government—including NARA—are seen by much of the American public as President Biden harassing and ultimately raiding the residence of his chief political rival without any sort of public explanation or justification.  To take two examples covered by the media:

- "Nothing like this has ever happened to a President of the United States before," Trump said in a statement on Monday.  "After working and cooperating with the relevant Government agencies, this unannounced raid on my home was not necessary or appropriate."  CBS, *FBI Took Boxes and Documents in Trump Search* (Aug. 9, 2022).

- Republicans blasted the search, with House Minority Leader Kevin McCarthy vowing that if the party takes back the House, "we will conduct immediate oversight of this department, follow the facts and leave no stone unturned."  He warned, "Attorney General Garland: preserve your documents and clear your calendar."  *Id.*

14

36.     A Trafalgar Group poll taken from August 9—August 10 reflects the raid's very

real impact on public confidence in the integrity of the Government.  When asked "who do you

believe is behind the FBI's raid on President Trump's private home?" 47.9 percent of

respondence indicated "Trump's political enemies," only 39.7 percent "The impartial justice

system," and 12.4 percent "Not sure."  https://www.thetrafalgargroup.org/wp-

content/uploads/2022/08/COSA-FBI-Raid-Motivation-Full-Report-0810.pdf (last visited Sept. 6,

2022).  For independents, the numbers held at 53.9 percent, 35.3 percent, and 10.8 percent,

respectively.  *Id.*

## **PLAINTIFF'S FOIA REQUEST**

37.     Plaintiffs submitted their FOIA request on August 11, 2022.  ("Request" or

"Plaintiff's FOIA Request") (Ex. 1).  The Request sought:

1. All records and communications of the Archivist and (Acting) Archivist; Deputy
Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the
Chief of Staff, Communications and Marketing Division, and the Executive Secretariat)
with any individuals from the domain [(@doj.gov) OR (@fbi.gov) OR (@who.eop.gov)
OR (@ovp.eop.gov) OR (@nsc.eop.gov)] AND [(Bedminster) OR (Bedminster Golf
Club) OR (Trump Tower) OR (Tower) OR (Mar-a-Lago Club) OR (Mar-a-Lago)].

2. All records and communications of the Archivist and (Acting) Archivist; Deputy
Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the
Chief of Staff, Communications and Marketing Division, and the Executive Secretariat)
regarding [(Bedminster) OR (Bedminster Golf Club) OR (Trump Tower) OR (Tower)
OR (Mar-a-Lago Club) OR (Mar-a-Lago)] AND [boxes]].

3. All records and communications of the Archivist and (Acting) Archivist; Deputy
Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the
Chief of Staff, Communications and Marketing Division, and the Executive Secretariat)
regarding [(Bedminster) OR (Bedminster Golf Club) OR (Trump Tower) OR (Tower)
OR (Mar-a-Lago Club) OR (Mar-a-Lago) AND [(PRA) OR (Presidential Records
Act)]].

4. All records and communications of the Archivist and (Acting) Archivist; Deputy
Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the
Chief of Staff, Communications and Marketing Division, and the Executive Secretariat)

regarding [(Bedminster) OR (Bedminster Golf Club) OR (Trump Tower) OR (Tower) OR (Mar-a-Lago Club) OR (Mar-a-Lago)] AND [(felony) OR (Misdemeanor)].

5.  All records communications of the Archivist and (Acting) Archivist; Deputy Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the Chief of Staff, Communications and Marketing Division, and the Executive Secretariat) regarding [election] AND [(DOJ) OR (Dept of Justice) OR (Federal Bureau of Investigation) OR (FBI)].

6.  All records and communications of the Archivist and (Acting) Archivist; Deputy Archivist; Office of General Counsel; and the Office of the Chief of Staff (including the Chief of Staff, Communications and Marketing Division, and the Executive Secretariat) regarding Title 44 Section 3106.

7.  All records and communications between any employee or agent of NARA and the FBI or Department of Justice, including the Offices of the United States Attorneys, regarding former President Trump.

8.  All records and communications between or among employees or agents of NARA regarding any documents in the possession of former President Trump.

9.  All records produced or contributed to by any employee or agent of NARA and submitted to a U.S. federal district court, magistrate, or judge.

10.  All records and communications sufficient to show the process by which NARA collects documents after a presidential transition.

Request at 1–2.  The temporal scope of the Request was January 10, 2021 to present.

38.     The Request also sought a fee waiver based on Heritage's status as a 501(c)(3) nonprofit, Plaintiffs' non-commercial purpose, Plaintiffs' status as representatives of the news media, and the fact that "[t]he requested information is in the highest public interest since the raid on former President Trump's residence in Florida was supposedly based on the Presidential Records Act." *Id.* at 4.

39.     Finally, the Request sought expedited processing pursuant to 36 C.F.R. § 1250.28(a)(4) because the Request concerned "[a] matter of widespread and exceptional media

interest in which there exist possible questions that affect public confidence in the Government's integrity."

40.     The Request explained:

As per [36 C.F.R.] § 1250.28 (a)(4), on August 8th the FBI executed a search warrant at former President Donald Trump's home in Florida on Monday, and a CBS News source told CBS News on Monday that the search was "related to PRA," or the Presidential Records Act."  As per 44 U.S.C. §3106, In the event of unlawful removal, defacing, or erasure of records, the related Federal Records Act (44 U.S.C. Chapters 21, 29, 31, and 33) requires the Archivist to initiate action through the Attorney General for the recovery of the records.  Therefore, if this investigation was part of Presidential records Preservation, then the Archivist had a role in one of the most scrutinized warrant in US History.  This raid and what transpired before and after it has affected American public confidence.  As per the Trafalgar Group poll conducted after the Trump raid, 53.9 percent of likely [independent] general election voters believe Trump's political enemies are behind the FBI raid on President Trump's private home, and only 35.3 percent of likely [independent] general election voters believe it is due to an impartial justice system.  I affirm that this request for expedited processing certified to be true and correct.

*Id.* at 4–5 (footnotes omitted).

### NARA's Failure to Adhere to Statutory Timelines

41.     On August 11, 2022, a member of the staff at NARA's Office of the General Counsel emailed Plaintiffs to inquire as to why Plaintiffs' FOIA Request had been submitted both via email and via the FOIAonline database.  Email from Ashley Brian to OversightProject@heritage.org (Aug. 11, 2022 3:25 PM) (Ex. 2).  Plaintiffs responded:  "This is the same FOIA request but we wanted to ensure it was received since it requested expedited processing.  You can remove the duplicate from the FOIAOnline Database."  Email from OversightProject@heritage.org (Aug. 11, 2022 4:22 PM).

42.     On August 20, 2022, Plaintiffs transmitted a letter via email "to supplement the record in support of my request for expedited processing."  Letter from Roman Jankowski to NARA FOIA Officer (NGC) (Aug. 20, 2022) (Ex. 3).  The Letter attached 3 Appendices.  Appendices A and C contained 1455 and 2589 pages of Westlaw prints of news articles and

news broadcast transcripts relevant to the Request. *Id.* Appendix B contained "a statement by the Attorney General and Court filings in *In Re Search Warrant*, 22-mj-08332 (BER) (S.D. Fla.)."[4]

43.     10 calendar days from August 11, 2022 is August 21, 2022.

## FIRST CLAIM FOR RELIEF
### Violation FOIA, 5 U.S.C. §552
### Failure to Conduct Adequate Searches for Responsive Records.

44.     Plaintiffs re-allege paragraphs 1–43 as if fully set out herein.

45.     FOIA requires all doubts to be resolved in favor of disclosure. "Transparency in government operations is a priority of th[e Biden] . . . Administration." Attorney General, *Memorandum for Heads of Executive Departments and Agencies: Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

46.     Plaintiffs properly requested records within the possession, custody, and control of Defendant.

47.     Defendant is subject to FOIA and therefore must make reasonable efforts to search for requested records.

48.     Defendant has failed to promptly review agency records for the purpose of locating and collecting those records that are responsive to Plaintiffs' FOIA Request.

49.     Defendant's failure to conduct searches for responsive records violates FOIA and the NARA regulations.

50.     Plaintiffs have a statutory right to the information they seek.

---

[4]  The Letter made clear that Plaintiffs' consider information relevant to the Request in the possession of NARA or the Department of Justice to be in the record. *Id.* ("In so far as Appendix B contains statements by the Attorney General and the Department of Justice on the subject matter of this Request, we consider them to be within the current record; we attach them as a matter of convenience to the National Archives and Records Administration.").

51.     Defendant is in violation of FOIA.

52.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

53.     Plaintiffs have no adequate remedy at law.

54.     Plaintiffs have constructively exhausted their administrative remedies.

**SECOND CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Withholding of Non-Exempt Responsive Records**

55.     Plaintiffs re-allege paragraphs 1–54 as if fully set out herein.

56.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

57.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

58.     Defendant is subject to FOIA, and therefore must release to a FOIA requester any non-exempt records and provide a lawful reason for withholding any records.

59.     Defendant is wrongfully withholding non-exempt records requested by Heritage by failing to produce any records responsive to Plaintiffs' FOIA Request.

60.     Defendant is wrongfully withholding non-exempt-agency records requested by Plaintiffs by failing to segregate exempt information in otherwise non-exempt records responsive to Plaintiffs' FOIA Request.

61.     Defendant's failure to provide all non-exempt responsive records violates FOIA and NARA regulations.

62.     Plaintiffs have a statutory right to the information they seek.

63.     Defendant is in violation of FOIA.

64.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

65.     Plaintiffs have no adequate remedy at law.

66.     Plaintiffs have constructively exhausted their administrative remedies.

**THIRD CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Denial of Fee Waiver**

67.     Plaintiffs re-allege paragraphs 1–66 as if fully set out herein.

68.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

69.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

70.     Defendant has constructively denied Plaintiffs' application for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) & (iii) and 36 C.F.R. § 1250.56(a).

71.     The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

72.     Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

73.     Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

74.     Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

75.     Plaintiffs have a statutory right to a fee waiver.

76.     Defendant is in violation of FOIA by denying a fee waiver.

77.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied a fee waiver to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

78.     Plaintiffs have no adequate remedy at law.

79.     Plaintiffs have constructively exhausted their administrative remedies.

**FOURTH CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Statutory Bar Against Charging Fees**

80.     Plaintiffs re-allege paragraphs 1–79 as if fully set out herein.

81.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

82.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

83.     The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

84.     Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

85.     Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

86.     Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

87.     Defendant has not determined "more than 5,000 pages are necessary to respond to this request," or discussed with Plaintiffs how Plaintiffs "could effectively limit the scope of the request." 5 U.S.C. § 552(a)(4)(A)(viii)(II)(cc).

88.     Defendant is currently statutorily barred from charging fees related to Plaintiffs' FOIA Request. Therefore, Defendant has a statutory right to have its request processed without being charged any fees.

89.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA. Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

90.     Plaintiffs have no adequate remedy at law.

91.     Plaintiffs have constructively exhausted their administrative remedies.

## FIFTH CLAIM FOR RELIEF
### Violation of FOIA, 5 U.S.C. § 552
### Wrongful Denial of Expedited Processing

92.     Plaintiffs re-allege paragraphs 1–91 as if fully set out herein.

93.     FOIA requires all doubts to be resolved in favor of disclosure. "Transparency in government operations is a priority of th[e Biden] . . . Administration." Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

94.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

95.     Plaintiffs properly asked that NARA expedite the processing of Plaintiffs FOIA Request, based upon Plaintiffs' showing of that the Request concerns "[a] matter of widespread

and exceptional media interest in which there exist possible questions that affect public confidence in the Government's integrity."  36 C.F.R. § 1250.28.

96.     Defendant refused to expedite Plaintiffs' FOIA Request, contrary to the factual and legal showing Plaintiffs' made demonstrating their entitlement to expedition.

97.     Defendant is in violation of FOIA.

98.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled on an expedited basis and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

99.     Plaintiffs have no adequate remedy at law.

100.    Plaintiffs has exhausted all required administrative remedies with respect to Defendant's failure to make a determination on Plaintiffs' request for expedition.

**WHEREFORE** as a result of the foregoing, Plaintiffs pray that this Court:

A.     Enter a preliminary and permanent injunction compelling Defendant to process Plaintiffs' FOIA Request on an expedited basis.

B.     Order Defendant to conduct a search or searches reasonably calculated to uncover all records responsive to Plaintiffs' FOIA Request;

C.     Order Defendant to produce, within twenty days of the Court's order, or by such other date as the Court deems appropriate, any and all non-exempt records responsive to Plaintiffs' FOIA Request and indexes justifying the withholding of any responsive records withheld in whole or in part under claim of exemption;

D.     Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to Plaintiffs' FOIA Request;

E.     Enjoin Defendant from assessing fees or costs for Plaintiffs' FOIA Request;

F.     Retain jurisdiction over this matter as appropriate;

G.     Award Plaintiffs their costs and reasonable attorneys' fees in this action as provided by 5 U.S.C. § 522(a)(4)(E); and

H.     Grant such other and further relief as this Court may deem just and proper.


Dated:  September 6, 2022                    Respectfully submitted,


                                            /s/ Samuel Everett Dewey
                                            SAMUEL EVERETT DEWEY
                                            (No. 999979)
                                            Chambers of Samuel Everett Dewey, LLC
                                            Telephone:  (703) 261-4194
                                            Email:  samueledewey@sedchambers.com

                                            *Counsel for Plaintiffs*

                                            ROMAN JANKOWSKI
                                            (No. 975348)
                                            The Heritage Foundation
                                            Telephone:  (202) 489-2969
                                            Email:  Roman.Jankowski@heritage.org

                                            *Pro Se*